UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| TEVIN X. BONNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:20-cv-00082-SEB-DML |
| | ) | |
| ROBERT NUTTER, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT, DENYING
PLAINTIFF'S MOTIONS FOR SUMMARY JUDGMENT, AND DIRECTING ENTRY OF
FINAL JUDGMENT**

This action is based on Tevin Bonner's allegations that five correctional officers used
unreasonable force against him while detained at the Clark County Jail in January 2021 and then
prevented him from obtaining medical treatment for his injuries. Mr. Bonner and all five
defendants have moved for summary judgment. Because no evidence would allow a reasonable
jury to return a verdict in Mr. Bonner's favor, the Court grants the defendants' motions for summary
judgment, denies Mr. Bonner's motion, and directs that the Clerk enter final judgment.

**I.**
**Standard of Review**

Parties in a civil dispute may move for summary judgment, which is a way of resolving a
case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no
genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a
matter of law. *Id.*; *Pack v. Middlebury Comm. Schs.*, 990 F.3d 1013, 1017 (7th Cir. 2021). A
"genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving
party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that
might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572-73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court is only required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Tr. of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

When reviewing cross-motions for summary judgment, all reasonable inferences are drawn in favor of the party against whom the motion at issue was made. *Valenti v. Lawson*, 889 F.3d 427, 429 (7th Cir. 2018) (citing *Tripp v. Scholz*, 872 F.3d 857, 862 (7th Cir. 2017)). The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers, Local Union 150, AFL-CIO*, 335 F.3d 643, 647 (7th Cir. 2003).

## II.
## Factual Background

The following facts are undisputed for purposes of summary judgment except where noted.

## A.    Booking, Disciplinary History, and January 7 Rule Violation

Mr. Bonner was arrested and booked into the Clark County Jail on December 31, 2019. Dkt. 70-10 at 95. He was not a stranger to the Jail. Incident reports from previous detentions allege that Mr. Bonner attempted to assault an officer and escape in February 2018 and resisted officers who tried to book him in October 2019.  Dkt. 70-5 at 7–10.

On January 7, 2020, an officer issued an incident report alleging that Mr. Bonner ignored an officer's orders, obtained an electronic cigarette from another inmate in violation of Jail rules, and secured it in his cell before officers could confiscate it.[1] Dkt. 70-3 at 8. Officers reported the incident to Lieutenant Mary Miller, that evening's shift supervisor. Dkt. 70-6 at ¶¶ 4, 10. She phoned Major Robert Nutter, who was not on duty or at the Jail that evening. Dkt. 70-5 at ¶¶ 5, 8.

## B.    Preparation for Cell Extraction

Major Nutter instructed Lieutenant Miller "to take Bonner to a holding cell to be placed on administrative watch due to his alleged jail rule violation and to do what she needed to do in order to maintain control and discipline within the jail." *Id.* at ¶ 9. Major Nutter and Lieutenant Miller knew Mr. Bonner and were familiar with his history of misconduct. *Id.* at ¶ 10; dkt. 70-6 at ¶ 6. Major Nutter "instructed Lt. Miller to inform the officers to be careful interacting with Bonner due to his repeated aggressive and combative behaviors." Dkt. 70-5 at ¶ 11.

The defendants have filed security video showing Mr. Bonner's removal from the cell. Dkts. 39–40. The defendants' filing shows the book-in area of the Jail from four different angles as well as the cell from which Mr. Bonner was extracted, and an audio recording has been

---

[1] The veracity of this incident report has no bearing on the merits of Mr. Bonner's claims in this case. The Court cites it only to provide context for the incident that followed.

synchronized to the video. The unfolding scenario is reflected in that video and audio, unless another source is specifically cited.

Officers gathered in the book-in area about 9:50 P.M. About 9:52:47, Lieutenant Miller called six officers to meet with her in an area just out of the cameras' view. The meeting is not completely audible. After telling the group to move "a couple steps closer," Lieutenant Miller told the officers, "If he makes one [unintelligible], tase him." As the officers returned to the cameras' range, Lieutenant Miller said, "Put him down. He goes straight on the ground, guys. On the ground."

At the same time as the officers' briefing session, Mr. Bonner was seen on video opening his jumpsuit and carefully placing t-shirts or towels around his torso and pelvis.

## C.   Cell Extraction, OC Spray, and Tasers

Officers approached Mr. Bonner's cell at 9:54 P.M. Officer Tyler D'Alfonso shouted instructions to Mr. Bonner to lie down on the ground and repeated that warning approximately 20 times over the next three minutes.

For approximately 90 seconds, Mr. Bonner stood at the back end of the cell, questioning Officer D'Alfonso's orders and asking why the officers needed to confiscate his property. Although Mr. Bonner did not comply with Officer D'Alfonso's orders, he remained fairly still, facing the officers, keeping his hands visible and at his sides.

At 9:55:40, Officer D'Alfonso sprayed a burst of OC into the cell, then closed the door to let it saturate the room. *See* dkt. 70-8 at ¶ 21 (D'Alfonso Aff.). Mr. Bonner turned his face away from the door, took two towels out of his jumpsuit, and wrapped them around his face.

At 9:56:05, Officer D'Alfonso opened the door and sprayed a second burst of OC, this time aiming for Mr. Bonner's chest. *See* dkt. 70-8 at ¶ 23. Officers warned Mr. Bonner multiple times

to "get on the ground" and face the back wall of the cell or "get tased." At 9:56:27, Mr. Bonner crouched on one knee while facing the back of the cell. At 9:56:33, officers clarified that he must lie with his "belly on the ground" or be tased.

When Mr. Bonner did not move, Officer D'Alfonso stepped into the cell and said, "I'm gonna fuckin' tase you!" and fired his taser at Mr. Bonner at 9:56:42. Mr. Bonner lost his balance and fell onto his buttocks. Officer D'Alfonso did not believe that the prongs from the taser contacted Mr. Bonner's body because of the padding in his jumpsuit. *See* dkt. 70-8 at ¶¶ 29–30.

At 9:56:47, another officer's taser became visible on the video. Mr. Bonner spread both hands wide and said, "I'm goin'." He began to move slowly to the ground, first on his left hand, then onto his entire left arm and side.

At 9:56:54, Mr. Bonner was fully reclined on the floor his left side, with his face towards the ground. Lieutenant Miller said, "Tase his ass." Six officers were visible in the cell. One, Sgt. Doyle, fired the second taser. Mr. Bonner's body shook for a few seconds. Five officers quickly rolled Mr. Bonner to a prone position, cuffed his hands behind his back, and helped him stand up.

## D.    Post-Extraction Medical Examination and Shower

From the time Sgt. Doyle fired the second taser, multiple officers could be heard coughing. Mr. Bonner questioned the officers as to why they tased him; his breathing did not appear to have been affected by the OC spray. Although he expressed anger that the officers had tased him, he did not specifically complain of any pain.

Mr. Bonner was removed from the cell at 9:57:30. Officers walked him to the book-in desk. Lieutenant Miller radioed for medical personnel at 9:57:45 and instructed officers to take Mr. Bonner to the eyewash machine.

A nurse arrived at the book-in desk at 9:59:20. He appeared to remove the taser probes from Mr. Bonner's torso and asked, "Where's the other one at," suggesting that one probe may not have stuck to Mr. Bonner's body/clothing.

The nurse offered no other treatment and left the scene about 10:04:20. According to his affidavit, the nurse found no injuries requiring medical attention, and Mr. Bonner did not complain of any. Dkt. 70-11 at ¶¶ 11–12 (Dooley Aff.). Mr. Bonner spent much of the five minutes between the nurse's arrival and departure arguing with the nurse and the officers about whether he had deserved to be tased.

About 10:08, officers began the process of cutting off Mr. Bonner's jumpsuit so they could remove it without undoing his handcuffs. Once the jumpsuit was removed, officers also removed two pairs of shorts. Mr. Bonner was still wearing at least one long-sleeve and one short-sleeve shirt and a pair of boxer shorts when he entered the shower cell.

Mr. Bonner remained in the shower cell for approximately seven minutes and emerged wearing only a pair of boxer shorts. It is not clear whether they were the same boxer shorts he had been wearing when he entered the shower.

Officer Sean Chapman and Corporal Galloway assisted Mr. Bonner in the shower. Although Mr. Bonner remained handcuffed, they "made sure Bonner disinfected his hands, face, and body" and gave him "the opportunity to rinse his eyes." Dkt. 70-9 at ¶ 13 (Chapman Aff.). It does not appear that Mr. Bonner was taken to the eye wash station as Lieutenant Miller instructed. Officer Chapman and Corporal Galloway stated that they placed soap on a towel and washed Mr. Bonner's face. Dkt. 70-9 at ¶ 13. It is unclear whether Mr. Bonner was offered a clean set of underwear after the shower.

About 10:19, officers began helping Mr. Bonner into a new jumpsuit. At 10:22, four officers escorted Mr. Bonner to a new cell, where he was left without incident.

### E.    Confinement in Segregation Cell and Requests for Medical Care

Mr. Bonner's new cell was located in a segregation unit. Dkt. 70-3 at 11. He remained there until January 22, 2020. *Id.* at 19.

According to his summary judgment filings, Mr. Bonner was confined to his segregation cell 24 hours per day, except when released by Jail staff. *See* dkt. 45 at 4–5. Inmates are able to request medical attention through electronic kiosks, but Mr. Bonner could not access the kiosks except when facilitated by the Jail staff. *See, e.g.*, *id.* Jail records document that Mr. Bonner was taken to the kiosk on January 16, 17, and 22, and that he asked to go on January 20. Dkt. 70-3 at 16–19. Other records reflect that he submitted requests through the kiosk on January 18 and 26. *See* dkt. 70-10 at 4, 6.

Mr. Bonner says he made "many verbal requests" for medical treatment to defendants through his cell door. *See* dkt. 45 at 4; dkt. 46 at 15, 33. Although the record includes video and audio recordings of Mr. Bonner in his segregation cell, he does not direct the Court to specific times or days when he made such oral requests for medical care. Four defendants have submitted affidavits swearing that they never disregarded any request for medical treatment from Mr. Bonner. Dkt. 70-5 at ¶¶ 34–35; dkt. 70-6 at ¶¶ 58–59; dkt. 70-7 at ¶¶ 50–52; dkt. 70-8 at ¶¶ 42–44. The fifth, Corporal Galloway, asserts that no evidence shows that Mr. Bonner ever communicated a need for medical care to him. Dkt. 69 at 4.

Mr. Bonner submitted a written medical request through the kiosk on January 18, but it did not concern any injury from the January 7 incident. Dkt. 70-10 at 4. Mr. Bonner's complaint referenced his single sleeping mat, which was causing hip pain, and he asked for pain medication

and an additional mat. *Id.* On January 26, he submitted another request recounting the January 7 incident and stating his "head and wrist is broken out" from the OC spray. *Id.* at 6. However, he did not request treatment. He simply complained that his injuries had not been photographed. *Id.*

The nurse examined Mr. Bonner on January 27, 2020, in what the parties refer to as a routine "14-Day Evaluation" following any use of force. *See* dkt. 70-16 at ¶ 8. The nurse documented that Mr. Bonner had peeling skin near his wrists and that Mr. Bonner attributed the peeling to the OC spray used on January 7. Dkt. 70-15 at 8. However, the nurse observed that Mr. Bonner's wrists were not swollen, red, or infected. *Id.* The nurse has since filed an affidavit stating that, based on his experience examining patients exposed to OC spray, this type of skin condition likely would not be caused by OC. Dkt. 70-16 at ¶¶ 11–13.

## F.   Procedural History

Mr. Bonner filed suit on April 8, 2020. Dkt. 2. At screening, the Court identified viable Fourteenth Amendment claims against Major Nutter, Lieutenant Miller, Sgt. Doyle, Corporal Galloway, and Officer D'Alfonso.[2] The Court found these claims supported by the complaint's allegations that the defendants "used gratuitous and sadistic force against Mr. Bonner, ordered others to use such force, failed to intervene against such uses of force, denied him necessary medical treatment, or confined him in conditions that were designed to subject him to pain and suffering." Dkt. 11 at 3.

During discovery, the defendants served requests for admission, but Mr. Bonner did not respond to them. Dkt. 70-3 at 1–5. The requests included the following:

> 21. Admit you did not suffer any lasting burns on your skin from the mace sprayed on the floor of your cell on January 7, 2020, as evidenced by Exhibit E attached hereto.

---

[2] The **clerk is directed** to correct the spelling of these defendants' names on the docket.

. . .

23. Admit none of the Defendants used or ordered gratuitous or sadistic force against you.

24. Admit you suffered no new injuries as a result the [*sic*] any of the five defendants' actions alleged in your Complaint.

Dkt. 70-3.

The defendants filed individual motions for summary judgment in May 2021. Dkts. 23, 25, 27, 29, 31. In December 2021, Mr. Bonner filed a response and cross-motion for summary judgment. Dkts. 45, 46. The Court denied the defendants' motions without prejudice after they sought to amend their submissions.  Dkt. 55. The defendants have now filed amended summary judgment motions, dkts. 60, 62, 64, 66, 68, and responded to Mr. Bonner's cross-motion, dkt. 75.

## III.
## Analysis

From the summary judgment briefing, we discover that Mr. Bonner's claims fall into two broad categories: First, his claims that the defendants' use of OC spray and tasers on January 7 violated his Fourteenth Amendment rights against excessive force. Second, he claims that the defendants violated his Fourteenth Amendment rights by preventing him from obtaining medical treatment after January 7 for burns caused by the OC. Viewed in the light most favorable to Mr. Bonner, we hold that the evidence entitles the defendants to summary judgment on both sets of claims.

**A.     Force Claims**

A pretrial detainee proves a Fourteenth Amendment violation by showing that "force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97 (2015). "[O]bjective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

A non-exclusive list of considerations that "may bear on the reasonableness or unreasonableness of the force used" includes:

- the relationship between the need for the use of force and the amount of force used;

- the extent of the plaintiff's injury;

- any effort by the officer to temper or limit the amount of force;

- the severity of the security problem at issue;

- the threat reasonably perceived by the officer; and

- whether the plaintiff was actively resisting.

*Id.* (citing *Graham*, 490 U.S. at 396).

A jury determining whether force was objectively reasonable must consider the evidence "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* At summary judgment, though, the Court still must consider the officer's perspective and weigh the relevant considerations after viewing the evidence in the light most favorable to the nonmovant. *See Valenti*, 889 F.3d at 429.

The defendants argue that each use of force by them on January 7 was constitutional and that, in any event, qualified immunity precludes any liability on their part. "Qualified immunity is a doctrine that protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019) (cleaned up). Once a defendant raises qualified immunity as a defense, the burden shifts to the plaintiff to defeat it by showing "two elements: first, that the facts show a violation of a constitutional right, and second, that the constitutional right was clearly established at the time of the alleged violation." *Id.* (cleaned up). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified

10

immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (quoting *Reed v. Palmer*, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original)). The Court can consider the elements in either order. *Id.*

There are three ways to demonstrate that a right is "clearly established" for purposes of qualified immunity:

1. Identify a "closely analogous case finding the alleged violation unlawful."

2. Identify a clear trend in relevant caselaw giving "fair assurance that the recognition of the right by a controlling precedent was merely a question of time."

3. Demonstrate that this is a "rare case" of conduct "so egregious and unreasonable" that, even without relevant caselaw, "no reasonable official could have thought he was acting lawfully."

*Stockton v. Milwaukee Cnty.*, --- F.4th ---, No. 22-1116, 2022 WL 3210359, at *9 (7th Cir. Aug. 9, 2022) (quoting *Reed*, 906 F.3d at 547). In comparing the case at hand to controlling or otherwise apt precedents, the Court must "look to the 'specific context of the case,' not to 'broad propositions.'" *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Ultimately, a right is clearly established if "it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

**1. OC Spray**

The first challenged uses of force in question are the two bursts of OC spray by Officer D'Alfonso. Viewed in the light most favorable to Mr. Bonner, the video shows that Officer D'Alfonso approached Mr. Bonner's cell at 9:54 and issued repeated orders to him to lie down on the ground. For 90 seconds, Mr. Bonner defied those instructions by remaining standing at the back of the cell. Although his movements and posture were not aggressive, Mr. Bonner continued to resist Officer D'Alfonso's orders. In addition, he continued to stuff clothing or towels inside his jumpsuit. After continuing to order Mr. Bonner to lie down on the floor and waiting 90 seconds

for Mr. Bonner to comply, Officer D'Alfonso sprayed a single, short burst of OC into the cell. Mr. Bonner still did not comply with the officers' orders, instead turning his back to the spray and removing towels or clothing from within his jump suit to place over his face. Officer D'Alfonso sprayed a second burst of OC approximately 25 seconds later. Neither burst of OC made direct contact with Mr. Bonner's face. The video does not indicate that the OC caused Mr. Bonner any immediate pain or discomfort, although his later medical requests suggest he may have experienced longer-term discomfort from spray that had remained on his skin at locations other than his face.

Clearly, some of these evidentiary factors weigh in favor of Mr. Bonner, suggesting that Officer D'Alfonso's use of OC spray was objectively unreasonable. Mr. Bonner was not aggressively resisting the officers when the spray was utilized. In fact, he was standing at the back of the cell, some distance from the officers, with his hands located at his sides and visible to them. The officers' attempts to remove Mr. Bonner from his cell were prompted by a violation of prison rules, but the specific rule he broke was for possession of another prisoner's electronic cigarette, not for conduct that placed other inmates or Jail staff at risk of any immediate physical harm.

However, other evidence weighs against Mr. Bonner's claim of unreasonable force, to wit, his prolonged noncompliance with the officers' orders and his protective measures in padding his jumpsuit, which suggested his preparation for an altercation with the officers.

These evidentiary conflicts aside, the defendants are entitled to summary judgment as to Officer D'Alfonso's use of OC spray because that action did not violate any clearly established constitutional right. The caselaw as of January 2020, properly understood and applied, would not have placed every reasonable officer on notice that spraying two short, indirect bursts of OC

towards a pretrial detainee to obtain compliance after he had padded his clothing and refused orders for 90 seconds was objectively unreasonable.

Precedents considering the use of OC or pepper spray on pretrial detainees—particularly, post-*Kingsley* precedents—are not numerous. But precedents concerning officers' use of OC in arresting suspects are fairly frequent and closely analogous to our case. In both situations, the ultimate issue is whether the officer's use of force was objectively reasonable. *See Graham*, 490 U.S. at 395 ("[*A*]*ll* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard."). Indeed, the *Kingsley* framework for assessing Fourteenth Amendment excessive force claims borrows heavily from *Graham*. *See Kingsley*, 576 U.S. 389, 397–99 (citing *Graham*).

In that analogous context, the Seventh Circuit has noted that it is "often . . . reasonable to use pepper spray against a suspect who is physically resisting arrest." *Brooks v. City of Aurora, Ill.*, 653 F.3d 478, 486 (7th Cir. 2011). And in *Padula v. Leimbach*, the Seventh Circuit found it was not objectively unreasonable for officers to spray mace into the face of a seriously intoxicated (and possibly unconscious) person who "did not cooperate with the officers' repeated requests to step out of his car." *See Padula v. Leimbach*, 656 F.3d 595, 598–99, 603–604 (7th Cir. 2011). *Accord Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) ("Courts have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was either resisting arrest or refusing police requests, such as requests to enter a patrol car or go to the hospital. . . . Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee.").

Even if all the factual disputes before us, including all the reasonable inferences, were resolved in Mr. Bonner's favor, we cannot conclude that it would have been obvious to every

reasonable officer, law enforcement or correctional, that the Fourteenth Amendment prohibited the use of OC spray to secure Mr. Bonner's cooperation on January 7. *See Stockton*, 2022 WL 3210359 at *9. These facts are not in dispute: Mr. Bonner's noncompliance at the Jail continued for an extended time, the padding he installed in his jumpsuit suggested that he was preparing for an altercation with the officers, and neither of the two bursts of OC was sprayed directly in Mr. Bonner's face. Qualified immunity thus entitles Defendants to summary judgment for Plaintiff's claims based on the use of OC spray.

### 2. First Use of Taser

After Officer D'Alfonso sprayed a second burst of OC at 9:56:05, Jail officers present at the scene loudly, clearly, and repeatedly instructed Mr. Bonner to lie down on the floor with his belly flat on the ground and his head facing the back of the cell, warning that, if he failed to do so, he would be tased. By 9:56:42, when Officer D'Alfonso deployed his taser, Mr. Bonner still had not complied with his orders. During those moments, Mr. Bonner began to move forward toward the officers positioned at the front of the cell but still continued to remain crouched down on one knee.

Without doubt, "the use of a taser is 'more than a *de minimis* application of force,'" and is known to inflict "intense pain." *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 726 (7th Cir. 2013). A jury would therefore reasonably view the force used by Officer D'Alfonso in deploying the taser (in light of the pain Mr. Bonner experienced as a result) to be greater than that utilized with the OC spray.

But context matters: "whether and how much force is reasonable in a given situation can change as the situation develops." *Brooks*, 653 F.3d at 487. The evidence, viewed in a light most favorable to Mr. Bonner, unequivocally establishes that the threat Officer D'Alfonso encountered

from Mr. Bonner increased significantly during the 37 seconds between the second burst of OC spray and his deployment of the taser. Mr. Bonner had moved from the back wall of his cell to a location closer to the officers positioned at the front of the cell. The OC spray seemingly had no effect on Mr. Bonner. He remained in a crouched, defensive position, continuing to defy the officers' instructions. Mr. Bonner's movements toward the officers signaled active rather than passive resistance. Officer D'Alfonso's repeated commands to Mr. Bonner issued over a period of 37 seconds to lie down as well as the forewarnings that his resistance would result in his being tased demonstrated at least some level of restraint on the part of Officer D'Alfonso.

*Abbott* is useful in evaluating both of the deployments of the taser in this case. In *Abbott*, police arrested and tased two suspects. The first had been handcuffed, but had moved his hands to the front of his body and admitted that he "continued fighting" with officers after one application of the taser. *Abbott*, 705 F.3d at 727. "[G]enerally . . . the use of a taser against an actively resisting suspect does not violate clearly established law or is constitutionally reasonable." *Id.* (citing cases). The Seventh Circuit has characterized *Abbott* as setting "guideposts" for analyzing the use of tasers in the context of excessive force claims, the first of which is that "an officer's use of a Taser against an actively resisting subject either does not violate a clearly established right or is constitutionally reasonable." *Dockery v. Blackburn*, 911 F.3d 458, 467 (7th Cir. 2018).

In *Dockery*, the Seventh Circuit held that "declining to follow instructions while acting in a belligerent manner" can amount to active resistance that would make use of a taser objectively reasonable. *Id.* at 467 (citing *Forrest v. Prine*, 620 F.3d 739, 745–46 (7th Cir. 2011)). More specifically, taser use is objectively reasonable where a detainee refuses orders while "pacing in the cell, clenching his fists, and yelling obscenities." *Forrest*, 620 F.3d at 745. The use of a taser to subdue a detainee who is acting "'with aggression, disruption, and physical threat'" may be

deemed reasonable, where the officer warns the individual "*several times* that noncompliance would result in tasing." *Id.* (emphasis in original) (quoting *Lewis v. Downey*, 581 F.3d 467, 477 (7th Cir. 2009)).

The *Abbott* Court (in 2013) specifically referenced *United States v. Norris*, 640 F.3d 295, 303 (7th Cir. 2011), in which an officer had deployed a taser on a suspect who had ignored two commands to stop retreating, who had thrown evidence into the air, and who placed his hands near his waistband. Noting that the suspect "had displayed an unwillingness to accede to reasonable police commands, and [that] his actions suggested an intent to use violence to fend off further police action," the Court ruled that the officer's "use of his taser was reasonable under the circumstances." *Norris*, 640 F.3d at 303.

Applying these defendants, we hold that the defendants in the case before us are entitled to summary judgment on the claims arising from Officer D'Alfonso's use of his taser. Viewing the evidence in the light most favorable to Mr. Bonner, a jury would have no choice but to find that, even though the use of force and resulting pain were significant, Mr. Bonner's movement toward officers, in defiance of their orders to get on his belly and lie flat on the ground, his assumption of a defensive crouch in moving towards the officers, his protective efforts with the padded jumpsuit, and his protracted noncompliance all render the officer's use of force objectively reasonable. A reasonable jury could not conclude otherwise.

That determination aside, the defendants are nonetheless entitled to summary judgment based on qualified immunity. Qualified immunity is available to them to protect against liability unless "existing precedent . . . placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). We have held that the precedents above make Officer D'Alfonso's use of the taser objectively reasonable, but if they fall short of that standard,

it is clear that the law and the evidence before us at the very least invite debate, entitling the defendants to summary judgment based on qualified immunity. Accordingly, summary judgment shall be entered in favor of Defendants as to the first taser use.

### 3. Second Use of Taser

Approximately 12 seconds elapsed between the time Officer D'Alfonso tased Mr. Bonner and the time when Sgt. Doyle released the second shot. During those twelve seconds, Mr. Bonner seemed to wobble a bit from a loss of balance, winding up sitting on the floor on his buttocks, spreading his hands wide, and uttering the words, "I'm goin'" as he moved slowly down to the ground. OC remained on the floor surface, which might arguably have caused Mr. Bonner to move haltingly. When Lieutenant Miller ordered Sgt. Doyle to "tase his ass" and Sgt. Doyle pulled the trigger, a total of six officers were located inside the cell, and Mr. Bonner had fully reclined on the floor, lying on his side but with his face pointed towards the ground.

We concede that the reasonableness of the second deployment of the taser is a close call. However, guided by the applicable case law, we hold that its use did not violate the constitutional standards.

In *Abbott*, after being tased once, the second suspect fell to her knees and then onto her back after being tased once. 705 F.3d at 711. The deputy, who had tased her initially, ordered her to roll over onto her stomach, but she remained on her back, so he tased her a second time. *Id.* The Seventh Circuit found that a jury could find the use of force unreasonable despite the fact that she did not precisely comply with the deputy's orders. "[A]lthough she did not comply with Sweeney's order to turn over onto her stomach after the first tasing, she did not move and at most exhibited passive noncompliance and not active resistance." *Id.* at 730.

The Seventh Circuit ruled that the deputy in *Abbott* violated a clearly established right:

> [I]t was clearly established on June 25, 2007, that it is unlawful to deploy a taser in dart mode against a nonviolent misdemeanant who had just been tased in dart mode and made no movement when, after the first tasing, the officer instructed her to turn over. Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects.

*Id.* at 732.

*Abbott* represents clearly established law in this circuit. Indeed, it serves as a "guidepost" for excessive force claims involving tasers: "The second guidepost is that an officer may not use significant force (like a Taser) against a 'nonresisting or passively resisting' subject." *Dockery*, 911 F.3d at 467 (quoting *Abbott*, 705 F.3d at 732).

However, at least one key fact distinguishes Mr. Bonner's situation from the target in *Abbott*: In *Abbott*, the subject was "immobilized" at the time of the deployment of the second taser. *Abbott*, 705 F.3d at 711, 733 (describing suspect as "a noncompliant, nonmoving misdemeanor arrestee who had already been *immobilized* by an initial taser jolt") (emphasis added). Mr. Bonner was not immobilized by Officer D'Alfonso's first use of the taser. Following the first shot, Mr. Bonner lost his balance and collapsed onto his backside—perhaps because of the shock or perhaps because he was startled. Regardless, Mr. Bonner remained in control of his movements and reactions, and although he had dropped to the ground, he moved slowly and continued to communicate his objections to the officers, and remained in a position other than that which would have complied with officers' instructions.

By the time the second use of the taser occurred, the length of Mr. Bonner's standoff with the officers was approaching three minutes. Despite beginning to position himself face down, he still had not fully complied with the officers' directions. The OC apparently had had no effect on him, and at least Officer D'Alfonso believed that the prongs from the first taser shot had not contacted Mr. Bonner's body directly, due to the padding he had inserted into in his jumpsuit. *See* dkt. 70-8 at ¶¶ 29–30. This expanded factual context supports an inference that the threat posed

by Bonner, that had justified Officer D'Alfonso's initial use of force, had not been sufficiently deterred, thereby justifying Sgt. Doyle's second deployment of the taser.

In reaching this conclusion, we have not overlooked or ignored Lieutenant Miller's pre-extraction huddle, during which she ordered the officers to "tase him." Despite the meeting occurring outside the cameras' view and her speech being inaudible in major respects, she was heard to say, "If he makes one [unintelligible], tase him." A reasonable jury presented with those facts could conclude that Lieutenant Miller had encouraged Sgt. Doyle to "tase his ass," therefore justifying Sergeant Doyle's action as a good faith measure.

Putting aside Lieutenant Miller's role, we conclude that no reasonable jury, viewing the evidence in the light most favorable to Mr. Bonner, could find that Sgt. Doyle's use of the taser to inflict a second shot was unreasonable, given the duration of Mr. Bonner's refusal to comply with the officers' orders, his reluctance to move down onto the ground, and his installation of padding in his jumpsuit. Even if a jury were to find to the contrary, Defendants are entitled to summary judgment based on their qualified immunity. Clearly, Mr. Bonner had not been immobilized by the first taser jolt. *Abbott*, 705 F.3d at 711, 733. Perhaps Mr. Bonner was simply passively resisting, but Mr. Bonner's response was a clear indication that he was "declining to follow instructions while acting in a belligerent manner, " *Dockery*, 911 F.3d at 467, perhaps even acting "'with aggression, disruption, and physical threat'" after being warned "*several times* that noncompliance would result in tasing." *Forrest*, 620 F.3d at 745. The defendants are thus entitled to summary judgment on all uses of force, both on the merits and based on their qualified immunity.

**B.    Access to Medical Treatment**

Mr. Bonner also alleges in his lawsuit that Defendants violated his rights as a pretrial detainee by preventing him from receiving medical attention after being sprayed with OC.

Specifically, claims that he was confined in a cell which restricted his access to the kiosk where he could submit a medical request and that his oral requests for medical attention were also ignored.

A pretrial detainee proves that a denial of medical care violated his Fourteenth Amendment rights by proving two elements: First, that Defendants acted purposely, knowingly, or recklessly in denying the plaintiff's care; and, second, that action must have been objectively unreasonable. *Pittman ex rel. Hamilton v. Cnty. of Madison, Ill.*, 970 F.3d 823, 827 (7th Cir. 2020). Our review of the evidence requires us to conclude that no jury could find that Mr. Bonner satisfied both of these elements.

The video shows that Mr. Bonner was in the shower for approximately seven minutes following his removal from his cell. Mr. Bonner never complained of any burning sensation or other discomfort due to his exposure to the OC spray. The video also reveals no visible signs that he experienced any pain or discomfort after he was secured by the officers.

Four defendants submitted affidavits attesting that they never disregarded a request for medical treatment from Mr. Bonner. Dkt. 70-5 at ¶¶ 34–35; dkt. 70-6 at ¶¶ 58–59; dkt. 70-7 at ¶¶ 50–52; dkt. 70-8 at ¶¶ 42–44. The fifth, Corporal Galloway, avers that no evidence exists to establish that Mr. Bonner ever communicated to him a need for medical care. Dkt. 69 at 4. Even in segregation, Mr. Bonner was able to request or otherwise seek and receive medical care.

Mr. Bonner has not rebutted these statements with admissible contrary evidence. He concedes that surveillance video and audio capture him making such requests orally from his cell. The record includes video and audio excerpts from Mr. Bonner's cell at approximately 10:25 P.M. on January 7 until 3:20 P.M. on January 9. Mr. Bonner does not dispute this evidence—and he

also does not direct the Court to any evidence showing that he made oral requests to any of the defendants or that they ignored his requests.

A party opposing summary judgment "must support his factual assertions about disputed facts with citations to 'particular parts of the materials in the record,' and the court need consider only the cited materials (though it may consider other materials in the record)." *McKinney v. Office of Sheriff of Whitley Cnty.*, 866 F.3d 803, 808 (7th Cir. 2017). "A party opposing summary judgment does not meet this obligation by simply dropping a stack of paper into the court file (literally or electronically) and asserting that someone who reads the stack will find a genuine issue of material fact." *Id.* The Seventh Circuit has therefore "routinely affirmed grants of summary judgment when non-moving parties have failed to guide the court through their evidence." *Id.* (citing cases).

Mr. Bonner's request that the Court parse through 37 hours of audio and video recordings to discover a moment when he had enlisted one of the defendants to line up a doctor's visit misapprehends the Court's responsibilities. Identifying the evidence and discussing its meaning and significance is the responsibility of the parties. Accordingly, given Mr. Bonner's failures, we deem the defendants' assertions uncontroverted. S.D. Ind. L.R. 56-1(f)(1).

The remaining evidence concerning Mr. Bonner's alleged injuries strengthens the conclusion that the Jail staff responded reasonably to his medical needs. He was afforded immediate attention by the Jail nurse following his extraction from his cell, and no injuries were noted or ever documented from the January 7 incident. Even after Mr. Bonner obtained access to the electronic kiosks, he did not use them to request treatment for any injuries he suffered on January 7. Rather, he complained only about his sleeping mat and asked to have certain physical symptoms photographed (as opposed to treated). Dkt. 70-10 at 4, 6. Eventually, Mr. Bonner

received a routine 14-day review, which is a standard Jail medical procedure. *See* dkt. 70-16 at ¶ 8. No evidence has been adduced in the record that would permit a jury to find that additional medical attention was required or withheld.

Viewing the record in the light most favorable to Mr. Bonner, since no reasonable jury could find that any defendant purposely, knowingly, or recklessly denied Mr. Bonner medical attention, much less that they did so unreasonably, *Pittman*, 970 F.3d at 827, Defendants are entitled to summary judgment on all claims regarding medical care.

### IV. Conclusion

For the reasons discussed in Part III:

1. Mr. Bonner's motion for summary judgment, dkt. [45], is **denied**.

2. The defendants' motions for summary judgment, dkts. [60], [62], [64], [66], and [68], are **granted**.

3. The **clerk is directed** to **correct the spelling** of the following defendants' names on the docket: "Delfonso" should be "D'Alfonso," and "Gallaway" should be "Galloway."

4. This action is **dismissed with prejudice**.

5. The **clerk is directed** to enter **final judgment**.

**IT IS SO ORDERED.**

Date: 9/13/2022

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

TEVIN X. BONNER
CLARK COUNTY JAIL
CLARK COUNTY JAIL
Inmate Mail/Parcels
501 East Court Avenue
Jeffersonville, IN 47130

Corey J. Dunn
Stites & Harbison PLLC
cdunn@stites.com

R. Jeffrey Lowe
KIGHTLINGER & GRAY, LLP (New Albany)
jlowe@k-glaw.com